Filed 12/13/19

CERTIFIED FOR PARTIAL PUBLICATION[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E069293 |
| v. | (Super.Ct.No. FSB1502285) |
| STEPHEN DARRELL TAYLOR, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County. Kyle S. Brodie, Judge. Affirmed in part, reversed in part, and remanded with directions.

Steven A. Torres, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Scott C. Taylor and Charles C. Ragland, Deputy Attorneys General, for Plaintiff and Respondent.

---

[*]Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts I, II, and III of the DISCUSSION.

1

A jury convicted Stephen Darrell Taylor of numerous sex offenses against his adopted daughters, Jane Doe 1 and Jane Doe 2. In total, the jury convicted him on 12 counts. The trial court sentenced him to prison for a one-year determinate term and an aggregate indeterminate term of 165 years to life.

On appeal, Taylor argues that the court erred by admitting expert testimony on child sexual abuse accommodation syndrome (accommodation syndrome) and instructing the jurors that they could use that evidence to evaluate the victims' credibility. He also asserts several sentencing errors. He argues that the court erred by (1) imposing two indeterminate terms under the former "One Strike" law (Pen. Code,[1] former § 667.61, subd. (a)) for two offenses that occurred during a single occasion, (2) imposing multiple punishments for four counts of aggravated sexual assault and four counts of lewd acts arising from the same facts, and (3) imposing a restitution fine and court operations and facilities fees without an ability to pay hearing.

We agree that the court erred by imposing multiple punishments on four counts of aggravated sexual assault (counts 1 through 4) and four counts of forcible lewd acts (counts 5 through 8) that arose from the same conduct. Accordingly, we stay Taylor's sentence on counts 5 through 8. We also agree that the court should hold an ability to pay hearing, at least as to the court operations and facilities fees. We therefore reverse the order imposing those fees and remand for a hearing on Taylor's ability to pay them.

---

[1] Further undesignated statutory references are to the Penal Code unless otherwise indicated.

As to the restitution fine, Taylor has forfeited his contention. We otherwise reject Taylor's arguments and affirm.

BACKGROUND

I. *Offenses Against Doe 1*

Doe 1 was 18 years old when she testified at trial. She and Doe 2 are sisters. Doe 1, Doe 2, and their younger brother and sister were placed in the Taylor household as foster children. Doe 1 was in preschool when she was placed with the Taylors. They adopted her, but she did not recall at what age. She was removed from their home in 2008, when she was about nine years old.

With respect to Doe 1, the amended information charged Taylor with four counts of aggravated sexual assault (rape) of a child (§§ 261, subd. (a)(2), 269, subd. (a)(1)), one count for each year between 2004 and 2008. It also charged him with four counts of forcible lewd acts on a child (§ 288, subd. (b)(1)), one count for each year between 2004 and 2008.

Doe 1 was five years old when Taylor first raped her, and he continued to do so approximately once per week until she was removed from his home. He would take off his clothes and insert his penis into her vagina. She tried to push him off of her sometimes but was unable to do so. She told Taylor that she was going to report his sexual abuse. He said no one would help her or believe her because she was a child.

Taylor and his wife physically abused Doe 1 by hitting her with belts, hangers, or spoons. Doe 1 told a social worker investigating the physical abuse about Taylor's sexual abuse. The social worker talked to Taylor's wife about it, and his wife "hit [Doe

3

1] for that." Doe 1 was removed from the Taylor household because of the physical abuse.

Years later, in 2013, Doe 1 disclosed Taylor's sexual abuse to her foster mother. In March 2013, a forensic interviewer spoke with Doe 1, and a forensic pediatrician examined her. Detective Jason Frey of the San Bernardino County Sheriff's Department observed Doe 1's interview with the forensic interviewer. She reported that Taylor would remove his clothes, remove her clothes, and insert his penis into her vagina.

The forensic pediatrician concluded with reasonable medical certainty that Doe 1 had sustained a penetrating injury to her genitalia. The doctor discovered two abnormalities in Doe 1's genital area. She had a scar and tissue missing from her hymen. The abnormalities indicated that Doe 1 had suffered a penetrating injury that tore her hymen. Together with Doe 1's disclosures during interviews, the doctor's findings were "highly suspicious for sexual abuse."

In April 2015, Detective Frey called Taylor and pretended to be a counselor who was treating Doe 1. The detective had his wife pretend to be Doe 1 on the phone call. The detective's wife confronted Taylor about the sexual abuse. Taylor did not directly acknowledge the abuse but did not deny it. When the detective's wife, acting as Doe 1, asked Taylor "if he hated her when he did the sex things to her," Taylor said that he did not hate her, but he hated himself. He apologized to her more than once during the conversation. He also told her that he was sexually abused as a young boy, and "it took him many years to forgive that person." He said that forgiving someone meant "'[t]o forgive and never bring it up again.'"

4

In June 2015, Detective Frey and another officer interviewed Taylor at the sheriff's station. Taylor initially denied sexually abusing Doe 1 but then admitted to twice penetrating her vagina with his finger and twice penetrating her vagina with his penis.

Around this same time, Taylor's son confronted Taylor about Doe 1's and Doe 2's allegations of sexual abuse. Taylor said, "some of it was true," and he specifically admitted to "'penis penetration,'" but would say nothing further.

II. *Offenses Against Doe 2*

Doe 2 was 19 years old when she testified at trial. Taylor and his wife adopted Doe 2 at age five, and she was removed from their home at about age 10. She is deaf and learned sign language at age 11, after she left the Taylor household. Taylor and his wife did not know sign language. Doe 2 communicated with them using their "home language," which she described as "very basic signs, very gesture-like."

With respect to Doe 2, the amended information charged Taylor with three counts of lewd acts on a child (§ 288, subd. (a)) and one count of attempted forcible lewd act on a child (§ 288, subd. (b)(1)), all occurring between January 2003 and January 2008. This was roughly the five-year period during which Doe 2 lived in the Taylor household.

The prosecutor began by asking Doe 2 what Taylor did "when he touched [her] in a sexual way." Doe 2 replied: "When I would get in my bed in my room he would come into bed with me. He would take off my clothes. I would tell him, no, no. And then his wife would come out and he quickly—when his wife would come in the bedroom he would quickly get out of my bedroom." The prosecutor asked how many times that

5

happened, and Doe 2 said twice. She said that he touched her breasts when he took off her clothes, and then explained that he did not completely take off her shirt, but just lifted it up and "cupped" her breast. He stopped because his wife arrived home. The prosecutor asked if she remembered telling an interviewer that Taylor had touched her breasts over her clothing. Doe 2 replied that she remembered telling the interviewer that, and the incident did occur. She did not remember anything more specific about that incident.

On cross-examination, Doe 2 specified that the first time Taylor touched her breasts, it happened in his bedroom during the afternoon. Taylor's wife was not home. Doe 1 was outside playing in the yard. Doe 2 was not sure where her two younger siblings were. The incident stopped when Taylor's wife came home. The second time he touched her breasts also occurred in his bedroom. It was the afternoon again, and Doe 1 and her other siblings were in the yard. Again, Taylor's wife was not home.

Doe 2 initially said that she did not remember Taylor engaging in any other "sexual touching" with her. But then the prosecutor asked if she remembered telling the interviewer that Taylor tried to make her touch his penis. She recalled telling the interviewer that and described the incident. Taylor's wife was not there on this occasion, and Doe 2's "brother and sister were out and about." Taylor tried to "force [her] head down to him." His pants were unzipped, but she did not see his penis because she closed her eyes. She said, "no," and went to brush her teeth "because it smelt so bad."

On cross-examination, defense counsel referred to the "third incident involving [Taylor] pushing [Doe 2's] head" and asked if Doe 2 recalled what year that happened.

6

She did not recall, but it was probably summer.  Doe 1 was at home watching television, but Doe 2 was unsure where her younger siblings were. Taylor's wife was again not home.

The prosecutor also asked Doe 2 if she remembered telling the interviewer about an incident in which Taylor "called [her] to go to his room and he was not wearing a shirt."  They had the following exchange:

"Q     Do you remember what happened during that time?

"A     Yeah.

"Q     What happened?

"A     That's what I was explaining before.

"Q     I'm not sure what you mean.  You were explaining what before?

"A     Yeah, that's what I was telling you about the first story.

"Q     The one where he touched your breasts?

"A     When he touched my breasts.

"Q     Do you remember also telling the interviewer that he tried kissing you on your face?

"A     Yeah.

"Q     Did that happen?

"A     Yeah."

Detective Frey observed Doe 2's forensic interview, which took place in March 2013, like Doe 1's interview.  According to Detective Frey, Doe 2 described two different incidents in which Taylor touched her breasts, once under her clothing and once

over her clothing. He also testified: "Another occasion, she described Mr. Taylor was just wearing his boxers. He was not wearing any shirt and was kissing her on her face and then at that time, unzipped his zipper." The prosecutor asked the detective whether Doe 2 described "any specific incident that occurred with respect to [Taylor's] penis." The detective replied that Doe 2 said Taylor tried to put his penis in her mouth, and afterward, she went to the bathroom and brushed her teeth.

In 2008, like Doe 1, Doe 2 was removed from the Taylor household because of physical abuse. Doe 2 told social workers in 2008 about the physical abuse, but she did not report the sexual abuse until 2013. She did not report the sexual abuse initially because she was "very scared" and had difficulty trusting people. She tried to tell Taylor's wife about the sexual abuse when she lived in the Taylor household, but his wife did not believe her.

III. *Accommodation Syndrome Evidence*

Dr. Jody Ward is a clinical and forensic psychologist who testified about accommodation syndrome. The syndrome is a pattern of behaviors exhibited by many but not all children who have been sexually abused within an ongoing relationship. It is not a diagnosis but a therapeutic instrument to help children and their families understand children's reactions to sexual abuse. Dr. Ward had never met Doe 1 and Doe 2, had not read the police reports in the case, had not interviewed Taylor, and had not otherwise been provided with the facts of the case. Her purpose in testifying was not to diagnose anyone, and she had no opinion on the case. Her purpose was "just [to] help people understand children's behavior better in general."

8

Accommodation syndrome consists of five elements: (1) secrecy; (2) helplessness; (3) entrapment and accommodation; (4) delayed, unconvincing disclosure; and (5) recantation. Not all five elements are present in every case. Secrecy refers to children's tendency to keep sexual abuse a secret when the perpetrator is a family member or close friend of the family, even without threats or any direction at all from the perpetrator. Helplessness refers to the power differential between children and adults. Children are taught to obey adults and are completely dependent on adults for material and emotional needs. Entrapment and accommodation refers to the situation children find themselves in because of their powerlessness—they cannot provide for themselves and escape the adult who is abusing them, so they find other ways to cope with the abuse. Some children learn to acquiesce in or go along with the abuse as a way to survive, to keep the family together, to get their material and emotional needs met, or to protect other children in the home. They disassociate or "put themselves mentally somewhere else while the abuse is occurring."

Delayed, unconvincing disclosure means that many child victims do not report sexual abuse until months or years after it happens, and many never report it at all. If they do report it, the disclosure initially tends to be hesitant or tentative in nature, and then they might disclose more over time, as they become more comfortable with the disclosure process. They may disclose the abuse once they are in a new home where they feel comfortable.

The last element, recantation, occurs less often than the other four elements. But occasionally, children disclose abuse and then later say they do not remember it or recant

9

the allegations altogether. Some children feel pressure to recant when the disclosure causes family ruptures or results in removal from their home, or they have to endure a number of intrusive interviews by police officers, social workers, and mental health professionals.

DISCUSSION

I. *Expert Testimony and Jury Instruction on Accommodation Syndrome*

Taylor contends that the court erred by admitting Dr. Ward's testimony on accommodation syndrome. He argues that the evidence was more prejudicial than probative under Evidence Code section 352. Relatedly, he argues that the pattern jury instruction on accommodation syndrome (CALCRIM No. 1193) erroneously told the jurors that they could consider the evidence in determining the victims' credibility. We reject both arguments.

Expert testimony on accommodation syndrome is not admissible "to prove that the complaining witness has in fact been sexually abused." (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1300 (*McAlpin*).) It is admissible, however, to bolster the credibility of the complaining witness "when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation." (*Ibid.*) "'Such expert testimony is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior.'" (*Id.* at p. 1301.) Thus, "[t]he testimony is pertinent and admissible if an issue has been raised as to the victim' s credibility" (*People v. Patino* (1994) 26 Cal.App.4th 1737, 1745) because of

10

"paradoxical behavior, including a delay in reporting a molestation." (*Id*. at p. 1744.) Moreover, the prosecution may introduce evidence of accommodation syndrome in its case-in-chief rather than wait until rebuttal. (*Id.* at p. 1745.)

Evidence relating to the credibility of a witness is relevant. (Evid. Code, § 210.) The court may exclude relevant evidence "if its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice . . . ." (Evid. Code, § 352.) "The prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence." (*People v. Karis* (1988) 46 Cal.3d 612, 638.) "'[E]vidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction.'" (*People v. Doolin* (2009) 45 Cal.4th 390, 439.) We review the court's decision to admit evidence for abuse of discretion. (*Id.* at p. 437.)

In this case, the court did not abuse its discretion by admitting Dr. Ward's testimony. The evidence was relevant because the victims' credibility was at issue. Doe 1 and Doe 2 kept the abuse secret for years, and after their initial disclosures to Taylor's wife or the social worker investigating physical abuse, they did not disclose the abuse again until five years after their removal from the Taylor household. It would be natural for the jurors to see this secrecy and the long delay in reporting as inconsistent with the victims' claims of sexual abuse.

Taylor argues that, in general, accommodation syndrome evidence is unduly prejudicial because jurors may use "the amorphous and indefinite characteristics of the syndrome" to support whatever version of events victims offer. He asserts that the evidence is "invariably one-sided and guilt-directed." In other words, his complaint is that such evidence is too favorable to the prosecution. This is not the type of prejudice that Evidence Code section 352 protects against. "Evidence is not prejudicial . . . merely because it undermines the opponent's position or shores up that of the proponent. The ability to do so is what makes evidence relevant." (*Vorse v. Sarasy* (1997) 53 Cal.App.4th 998, 1008.) Taylor has not identified how the evidence "uniquely tend[ed] to evoke an emotional bias against" him. (*People v. Yu* (1983) 143 Cal.App.3d 358, 377.)

Taylor also argues that the jurors could have misapplied the accommodation syndrome evidence "because the question of whether the victim's behavior was typical of sexual abuse victims is closely related to the ultimate question of whether sexual abuse actually occurred." He relies on other states' cases that have found the evidence inadmissible for all purposes. But as he acknowledges, California courts do not follow that approach, and they instead address the problem with a pattern jury instruction setting forth the limited purpose of the evidence (CALCRIM No. 1193). (E.g., *People v. Housely* (1992) 6 Cal.App.4th 947, 958-959.) The court in this case gave the pattern jury instruction, which stated: "You have heard testimony from Dr. Ward regarding child sexual abuse accommodation syndrome. [¶] Dr. Ward's testimony about child sexual abuse accommodation syndrome is not evidence that [Taylor] committed any of the

12

crimes charged against him. [¶] You may consider this evidence only in deciding whether or not [Doe 1's] or [Doe 2's] conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of their testimony." It is settled that the evidence was admissible for the limited purposes identified in the instruction, so Taylor's reliance on out-of-state cases is unavailing. (E.g., *McAlpin*, *supra*, 53 Cal.3d at p. 1300; *People v. Patino*, *supra*, 26 Cal.App.4th at pp. 1744-1745.)

Taylor's argument that the pattern jury instruction was wrong fares no better.[2] He contends that CALCRIM No. 1193 erroneously informed the jurors that they could use accommodation syndrome evidence to evaluate the victims' credibility. But the instruction correctly states the law in California. According to our Supreme Court's reasoning, the evidence is relevant precisely because it relates to the victim's credibility. (See *McAlpin*, *supra*, 53 Cal.3d at pp. 1299, 1302 [expert testimony about parents' common reactions to their child's molestation gave "jurors information they needed to objectively evaluate [the mother's] credibility," and "the evidence was clearly relevant" in that it "tended to rehabilitate the testimony of [the mother] as a corroborating witness"].)

---

[2] We reject the People's argument that Taylor forfeited this contention by failing to object to the instruction in the trial court. "[W]e may review any instruction which affects the defendant's 'substantial rights,' with or without a trial objection. [Citation.] 'Ascertaining whether claimed instructional error affected the substantial rights of the defendant necessarily requires an examination of the merits of the claim—at least to the extent of ascertaining whether the asserted error would result in prejudice if error it was.'" (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1087.)

In sum, the court did not abuse its discretion by admitting the accommodation syndrome evidence, and it correctly instructed the jurors that they could use the evidence to evaluate the victims' credibility.

II. *One Strike Law Sentencing*

The court sentenced Taylor under the One Strike law to eleven consecutive terms of 15 years to life. This was his sentence for the four counts of aggravated sexual assault of Doe 1, the four counts of forcible lewd acts on Doe 1, and the three counts of lewd acts on Doe 2. For the remaining count of attempted forcible lewd act on Doe 2, he received a one-year determinate sentence.

Taylor contends that two lewd acts on Doe 2 necessarily occurred during the same encounter. He argues that under a former version of the One Strike law, the court could impose only one 15-year-to-life term for all offenses committed during a single occasion. Thus, he asserts, we must reverse his indeterminate sentence on one of the lewd act convictions involving Doe 2. We conclude that the argument lacks merit.

A. *One Strike Law Background*

The One Strike law, section 667.61, "ensures serious sexual offenders receive long prison sentences whether or not they have any prior convictions." (*People v. Wutzke* (2002) 28 Cal.4th 923, 929.) It requires indeterminate life terms for certain sex offenses, including lewd act on a child. (§§ 288, subd. (a), 667.61, subd. (c)(8); *People v. Hiscox* (2006) 136 Cal.App.4th 253, 257.) Conviction of a One Strike offense alone does not trigger the special sentencing provisions. (*People v. Wutzke*, *supra*, at p. 930.) The People must also plead and prove an aggravating circumstance. (*Ibid.*) One aggravating

14

circumstance is the defendant's conviction of a qualifying offense "against more than one victim." (§ 667.61, subd. (e)(4).) With exceptions not relevant here, a defendant convicted of qualifying offenses against multiple victims in the same case should receive a sentence of 15 years to life for each qualifying offense. (§ 667.61, subds. (b), (e)(4); *People v. Rodriguez* (2012) 207 Cal.App.4th 204, 213.)

The former version of the One Strike law on which Taylor relies was in effect from 1994 to 2006. (Former § 667.61, subd. (g), added by Stats. 1994, 1st Ex. Sess. 1994, ch. 14, § 1; *People v. Jackson* (2016) 1 Cal.5th 269, 355.) Former subdivision (g) of the law provided that the indeterminate term "shall be imposed on the defendant once for any offense or offenses committed against a single victim during a single occasion." (Former § 667.61, subd. (g).) "[S]ex offenses occurred on a 'single occasion' if they were committed in close temporal and spatial proximity." (*People v. Jones* (2001) 25 Cal.4th 98, 107.) The rule thus "'result[ed] in a *single* . . . sentence . . . for a sequence of sexual assaults by [a] defendant against one victim that occurred during an uninterrupted time frame and in a single location.'" (*People v. Jackson*, *supra*, at p. 355.) The Legislature abrogated this restriction by eliminating former section 667.61, subdivision (g), in the September 2006 amendments to the One Strike law. (*People v. Rodriguez*, *supra*, 207 Cal.App.4th at pp. 213-214.)

B. *Application of the Former Version*

Taylor contends that the court was required to apply the former version of the One Strike law (former § 667.61, subd. (g)) to avoid an ex post facto violation. The People do not challenge the premise that the court should have used the former version of the One

15

Strike law. Instead, they argue that even accepting the premise, the court did not err. We agree with Taylor that the former version of the One Strike law applied.

The amended information alleged that all of the offenses against Doe 2 occurred between January 2003 and January 2008, and the jury was so instructed. The time period straddles the operative date of the 2006 amendments repealing former section 667.61, subdivision (g).

The ex post facto clauses of the state and federal Constitutions "protect against the later adoption of a statute that inflicts greater punishment than the law in effect at the time of the commission of the crime." (*People v. Riskin* (2006) 143 Cal.App.4th 234, 244.) The September 2006 amendment to the One Strike law increased the punishment for Taylor's offenses if he committed more than one on a single occasion. He had a right to be sentenced under the terms of the law in effect when he committed his offenses. (*People v. Hiscox*, *supra*, 136 Cal.App.4th at p. 261.) And for the amended law to apply, the People had to prove that he committed the offenses after the September 2006 effective date. (*Id*. at p. 260.)

The People failed to do this. Doe 2 described how Taylor abused her, but she did not specify when the offenses occurred during the 2003 to 2008 time period. Consequently, the court was required to apply the former version of the One Strike law, imposing only one indeterminate sentence "per victim per episode of sexually assaultive behavior." (*People v. Jones*, *supra*, 25 Cal.4th at p. 107.)

That said, the record suggests that the court *did* apply the former version of the One Strike law. At the beginning of the sentencing hearing, the court referred to an

16

in-chambers discussion about the probation report and the recommended sentence. The court stated: "Specifically, we discussed some of the details of the basis for the sentence, by which I mean the sentence given that these offenses happened some time ago. There have been some changes in the law since then so we did some research. Court did some research as well regarding the relevant statutes that were in place and that would be applicable to the times that these offenses were committed." Later, when the court began to announce Taylor's sentence, it explained that it was imposing a 15-year-to-life term under section 667.61, subdivisions (b) through (e), and it asked the prosecutor whether that was correct. The prosecutor replied: "That's correct, your Honor. Back in 2003 it was actually [section] 667.61[, subdivision] (e)(5)." So it appears that the court applied the 2003 version of the One Strike law, the same former version that Taylor urges us to apply.

C. *Substantial Evidence of Different Occasions*

To impose three indeterminate terms for the three lewd act offenses against Doe 2, the court had to find that each of the lewd acts occurred on different occasions. (Former § 667.61, subd. (g).) Taylor does not discuss which standard of review applies to an implied finding that the lewd acts occurred on different occasions, nor do the People.

Whether offenses occurred on a single occasion or on different occasions is a question of fact. Appellate courts review factual determinations for substantial evidence. (*People v. Ortiz* (2012) 208 Cal.App.4th 1354, 1378.) Accordingly, we ask whether there is substantial evidence, contradicted or uncontradicted, to support the court's determination, and we presume the existence of every fact the court could reasonably

17

deduce from the evidence.  (*Ibid*.; see also *People v. Chan* (2005) 128 Cal.App.4th 408, 424 [noting that substantial evidence supported the court's finding that offenses occurred on "separate occasions" for purposes of § 667.6, subd. (d)].)  "'If such substantial evidence be found, it is of no consequence that the trial court believing other evidence, or drawing other reasonable inferences, might have reached a contrary conclusion.'" (*People v. Ortiz, supra*, at p. 1378, italics omitted.)

Taylor asserts that the three lewd act offenses consisted of twice touching Doe 2's breasts and once forcing her head toward his penis, and according to her testimony, all of those acts occurred during two encounters:  On one occasion, he touched her breasts, and on another occasion, he touched her breasts *and* forced her head toward his penis.  But as the People point out, the incident in which he tried to force oral copulation formed the basis for the attempted forcible lewd act count.  The court imposed a one-year term for that offense, not an indeterminate term under the One Strike law.  The court could impose a sentence for the attempted forcible lewd act, just not an indeterminate One Strike sentence.  (Former § 667.61, subd. (g) ["Terms for other offenses committed during a single occasion shall be imposed as authorized under any other law . . ."]; *People v. Fuller* (2006) 135 Cal.App.4th 1336, 1343.)  Accordingly, the sentencing for those three acts did not violate the "single occasion" rule.

Moreover, substantial evidence supports the determination that Taylor committed three lewd acts on three different occasions apart from the attempted oral copulation. Doe 2 described two incidents when he touched her breasts, once under her clothing and once over her clothing.  During one incident Doe 1 was playing in the yard, but Doe 2

18

was unsure where the youngest two siblings were. During the second incident, Doe 1 *and* the other siblings were in the yard. (Even Taylor concedes that these two incidents did not occur on a single occasion.) The third incident occurred when Taylor was shirtless and kissing Doe 2's face. Doe 2's testimony, though unclear, suggested that Taylor "tried" to kiss her face on an occasion when he also touched her breasts. But according to Detective Frey's observations of her forensic interview, she described an incident in which Taylor was shirtless and "kissing her on her face," and this was "[a]nother occasion" apart from the times when he touched her breasts. The testimony of a single witness constitutes substantial evidence, so long as the testimony is not physically impossible or inherently improbable, and Detective Frey's testimony is neither. (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) On this record, a trier of fact could reasonably conclude that the three acts—twice touching her breasts and once kissing her face—occurred on three different occasions.

Taylor does not expressly address the kissing incident. Instead, in response to the People's argument that the three acts occurred on different occasions, he characterizes Doe 2's testimony as confusing, declares that only two total encounters occurred, and says that we "will need to resolve that factual issue." We do not resolve factual disputes or inconsistencies in the evidence. (*People v. Young*, *supra*, 34 Cal.4th at p. 1181.) That is the province of the trial court, and we determine only whether substantial evidence supports the court's findings. (*Ibid.*) In this case, it does.

For the foregoing reasons, the court did not err by sentencing Taylor to three indeterminate terms for the three lewd act offenses against Doe 2. Although the former

version of the One Strike law permitted only a single indeterminate term for all offenses committed on a single occasion, sufficient evidence shows the three lewd acts occurred on three different occasions.

III. *Section 654*

Taylor contends that the court should have stayed his sentence on the four forcible lewd act convictions involving Doe 1 (counts 5 through 8). He argues that the four acts of rape underlying those counts were also the basis for his conviction and sentence on the four aggravated sexual assault counts (counts 1 through 4). He therefore asserts that, under section 654, he cannot be punished twice for the same four acts of rape. We agree.

Section 654, subdivision (a), states: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." The statute "precludes multiple punishments for a single act or indivisible course of conduct." (*People v. Hester* (2000) 22 Cal.4th 290, 294.) When it applies, the court should sentence the defendant for each count but stay execution of sentence on those counts to which section 654 applies. (*People v. Jones* (2012) 54 Cal.4th 350, 353.)

A defendant's intent and objective determines whether a transaction constitutes an indivisible course of conduct. (*People v. Harrison* (1989) 48 Cal.3d 321, 335.) "[I]f all of the offenses were merely incidental to, or were the means of accomplishing or facilitating one objective, [the] defendant may be found to have harbored a single intent and therefore may be punished only once. [Citation.] [¶] If, on the other hand, [the]

20

defendant harbored 'multiple criminal objectives,' which were independent of and not merely incidental to each other, he may be punished for each statutory violation committed in pursuit of each objective, 'even though the violations shared common acts or were parts of an otherwise indivisible course of conduct.'" (*Ibid.*)

When it comes to sex crimes in particular, if one sex offense "directly facilitates or is merely incidental to the commission" of another sex offense, section 654 bars separate punishment. (*People v. Madera* (1991) 231 Cal.App.3d 845, 855; see *People v. Perez* (1979) 23 Cal.3d 545, 553-554 [declining to apply § 654 because "[n]one of the sex offenses was committed as a means of committing any other, none facilitated commission of any other, and none was incidental to the commission of any other"].) "For example, section 654 would bar separate punishment for applying lubricant to the area to be copulated" and the copulation itself. (*People v. Madera*, *supra*, at p. 855.) In this situation, the application of lubricant "directly facilitate[s]" the copulation. (*Ibid.*)

Whether the defendant harbored a single criminal intent or multiple objectives is a factual question for the trial court. (*People v. Liu* (1996) 46 Cal.App.4th 1119, 1134-1135.) We will uphold a court's implied finding that the defendant harbored separate intents and objectives if substantial evidence supports it. (*Id.* at pp. 1135-1136.)

The parties do not dispute that the four aggravated sexual assault convictions were based on Taylor's rape of Doe 1. The amended information charged rape as the underlying conduct for those counts, and the court instructed the jury that the People had to prove Taylor committed rape to find him guilty on those counts. But while Taylor says the four lewd act convictions were based on the same acts of penetration as the

rapes, the People argue that the four lewd act convictions were based on the separate acts of "removing [Doe 1's] clothes and getting on top of her" before penetrating her. They point out that they argued this theory to the jury.

Even if the jury could separately convict Taylor for undressing Doe 1 and climbing on top of her, whether the court could separately punish him for those acts is a different question. The court was required to find that Taylor harbored separate and independent criminal objectives when he (1) undressed Doe 1 and got on top of her and (2) penetrated her. There is no substantial evidence to support such a finding. The first two acts facilitated the rape and were incidental to it. No evidence whatsoever suggests that Taylor had an intent or objective for doing those things other than committing rape. In other words, the sequence of acts—undressing her, climbing on top of her, and penetrating her—was one indivisible course of conduct amounting to rape.

Our Supreme Court's decision in *People v. Greer* (1947) 30 Cal.2d 589 (*Greer*), overruled on another ground by *People v. Fields* (1996) 13 Cal.4th 289, 308, footnote 6, is instructive. The *Greer* court held that the defendant could not suffer separate convictions for statutory rape and lewd conduct arising out of the same act of sexual intercourse. (*Id.* at pp. 601-604.) There was "no question" that the same act of intercourse formed the basis for both convictions, because "[e]xcept for the rape itself, the only act of which [the victim] accused defendant was the forcible removal of her underclothing immediately preceding the rape." (*Id.* at p. 604.) The court observed: "To hold that the removal of the [victim's] underclothing constitutes an act separate from the rape, however, would be artificial in the present context and would permit double

22

punishment not authorized or contemplated by section 288." (*Ibid.*) Similarly, here, the People's attempt to divide the act of rape into two separately punishable acts is "artificial." There is no evidence that Taylor entertained multiple, independent criminal objectives when he raped Doe 1.

At oral argument, the People argued that the issue is not whether the sequence of Taylor's acts constituted one indivisible course of conduct. They contended that the four forcible lewd acts and the four aggravated sexual assaults represented eight different occasions of rape, thereby permitting separate punishment for each. (*People v. Kwok* (1998) 63 Cal.App.4th 1236, 1253 [acts committed on different occasions are separately punishable under § 654].) They relied on Doe 1's testimony that Taylor raped her approximately once per week until she left his home. Thus, according to the People, Taylor raped her 52 times per year, so there was substantial evidence to separately punish him for two rapes per year and eight rapes total. We are not persuaded by this argument.

We must examine the charging instrument, the verdict forms, the prosecutor's closing argument, and the jury instructions. (*People v. Siko* (1988) 45 Cal.3d 820, 826 (*Siko*).) If those things allow us to identify the "specific factual basis for a verdict, a trial court cannot find otherwise in applying section 654." (*People v. McCoy* (2012) 208 Cal.App.4th 1333, 1339.) In *Siko*, for instance, the People argued that the defendant could be punished separately for rape, sodomy, and lewd conduct with a child, where the lewd conduct consisted of undressing the victim and twisting a handkerchief around her neck. (*Siko*, *supra*, at pp. 822, 825.) Our Supreme Court found this argument "untenable." (*Id*. at p. 825.) There was no showing that the jury understood those acts as

23

the basis for the lewd conduct count.  (*Id.* at p. 826*.*)  Rather, the charging instrument and the verdict form both identified rape and sodomy as the lewd conduct at issue.  (*Ibid*.)  And nothing "in the prosecutor's closing argument or in the court's instructions suggest[ed] any different emphasis."  (*Ibid.*)

Our high court reached a similar result in *People v. Jones*, *supra*, 54 Cal.4th at page 350.  The defendant was convicted of possessing a firearm as a felon, carrying a concealed firearm, and carrying a loaded firearm.  (*Id.* at p. 352.)  The People argued that the trial court could impose multiple punishments because there were separate acts—the defendant possessed the gun at his grandmother's house for three days, and then he carried it in his car, where police found it on the day of his arrest.  (*Id.* at pp. 352, 359.)  The Supreme Court rejected that attempt to construct two factual bases for the convictions.  (*Id.* at p. 359.)  The charging instrument alleged that the defendant committed all three crimes "on or about May 26, 2008, the day he was arrested," and the verdict forms found him guilty as charged.  (*Ibid.*)  In closing argument, the prosecutor based the defendant's guilt on possession of the gun when he was arrested, and the prosecutor explained "that there were 'three different counts for the same exact conduct.'"  (*Ibid.*)  Thus, "[t]he record establishe[d] that the jury convicted defendant of each crime due to his being caught with the gun in the car on May 26, 2008, not due to any antecedent possession."  (*Ibid.*)  The court therefore permitted only one punishment for the three convictions.  (*Id.* at p. 360.)

As in *Siko* and *People v. Jones*, the record establishes that the jury did not understand the forcible lewd act counts in the fashion now urged by the People.  (*Siko*,

24

*supra*, 45 Cal.3d at p. 826; *People v. Jones*, *supra*, 54 Cal.4th at p. 359.) The amended information and the verdict forms did not identify the exact date or type of lewd acts underlying Taylor's convictions. The amended information merely charged him with one count of forcible lewd act per year from 2004 through 2008, and the verdict forms found him guilty as charged. Likewise, the jury instructions merely identified the year-long time frame during which Taylor allegedly committed each count. (For example, "Count 5 is alleged to have been committed between April 30, 2004, and April 29, 2005.")

But in the prosecutor's closing argument, she described the aggravated sexual assaults (counts 1 through 4) and the forcible lewd acts (counts 5 through 8) as comprising single instances of rape. At the start, she argued: "And when [Doe 1] testified, if you recall, she testified that the abuse occurred to her on pretty much a weekly basis. . . . So we're not asking for 52 counts for a year. We're asking for one count per year. So Counts 1 and 5 would be from '04 to '05, Counts 2 and 6 from '05 to '06, Counts 3 and 7 would be from '06 to '07, and Counts 4 and 8 would be from '07 to '08 . . . . [¶] . . . [¶] So the first set of counts that you need to look at are the Aggravated Sexual Assault on a Child. In order to prove the defendant guilty for these counts, the People have to prove that the defendant committed a violation of [section 261], which is rape . . . ." After discussing rape, the prosecutor argued: "Counts 5 through 8 are Forcible Lewd Act on a Child. This is also where we're seeking one count per year. The defendant willfully touched any part of the child's body, either on bare skin or through clothing. . . . [¶] So essentially [Taylor] touched [Doe 1] by removing her clothes and getting on top of her. It's important to recognize the difference between Counts 1

25

through 4 and 5 through 8 is that no penetration is required for Counts 5 through 8, whereas Counts 1 through 4, penetration is required."

The prosecutor did not argue that the jurors should hold Taylor accountable for two rapes per year, one during which an aggravated sexual assault occurred, and one during which a forcible lewd act occurred. Rather, the prosecutor argued that each forcible lewd act (removing Doe 1's clothes and getting on top of her) occurred during each rape. And importantly, she told the jurors that, while the People *could* have charged him with 52 rapes per year, they were charging him with only one per year. In light of the closing argument, the jurors could not have understood that they were being asked to convict Taylor for two rapes per year. The factual basis for the jury's verdict precludes the People's post hoc rationalization for separate punishment.

In sum, section 654 bars punishment for the four lewd act convictions involving Doe 1 on counts 5 through 8. We therefore must stay Taylor's sentence on those counts.

IV. *Ability to Pay Hearing*

At Taylor's sentencing hearing, the court imposed a $10,000 restitution fine, "given the circumstances of the crime" and "the facts surrounding it," and $840 in court operations and facilities fees. (§§ 1202.4, subd. (b), 1465.8, subd. (a)(1); Gov. Code, § 70373, subd. (a)(1).) In supplemental briefing filed with our permission, Taylor argues that the court violated his constitutional rights by assessing those amounts without an ability to pay hearing. He relies on *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), which another appellate district decided while this appeal was pending. The People contend that Taylor forfeited this argument, and even if he did not, there was no

26

*Dueñas* error.  We conclude that Taylor forfeited the argument as to the $10,000 restitution fine but not as to the $840 in court operations and facilities fees.  With respect to those fees, we reverse the order imposing them and remand for an ability to pay hearing.

A.  *The Dueñas Decision*

*Dueñas* held that it violates due process under the federal and state Constitutions to impose the court operations and facilities fees without first determining the convicted defendant's ability to pay them.  (*Dueñas*, *supra*, 30 Cal.App.5th at pp. 1168-1169.)  In addition, "to avoid serious constitutional questions" raised by the statutory restitution scheme, the court must stay execution of the mandatory restitution fine unless the court determines that the defendant has the ability to pay it.  (*Id.* at p. 1172.)  The same court that decided *Dueñas* has since clarified that, at the ability to pay hearing, the defendant bears the burden of showing his or her inability to pay, and the court "must consider all relevant factors," including "potential prison pay during the period of incarceration to be served by the defendant."  (*People v. Castellano* (2019) 33 Cal.App.5th 485, 490-491 (*Castellano*) [remanding for an ability to pay hearing]; accord *People v. Santos* (2019) 38 Cal.App.5th 923, 934 [on remand, the defendant must show his inability to pay, and the court may consider potential prison pay]; *People v. Kopp* (2019) 38 Cal.App.5th 47, 96 (*Kopp*), review granted Nov. 13, 2019, S257844 [same].)

Since *Dueñas*, some courts have criticized *Dueñas*'s due process analysis and have declined to follow it.  (E.g., *People v. Hicks* (2019) 40 Cal.App.5th 320, 322, 327-329, review granted Nov. 26, 2019, S258946 [holding that *Dueñas* was wrongly decided];

27

*People v. Caceres* (2019) 39 Cal.App.5th 917, 928 [declining to apply *Dueñas*'s "broad holding requiring trial courts in all cases to determine a defendant's ability to pay"].) Other courts have held that *Dueñas* was wrongly decided under due process principles, and that the Eighth Amendment's prohibition against excessive fines provides the proper framework for analyzing an ability to pay challenge. (E.g., *People v. Aviles* (2019) 39 Cal.App.5th 1055, 1069-1072; see also *Kopp*, *supra*, 38 Cal.App.5th at pp. 96-97 [applying *Dueñas*'s due process analysis to the fees but holding that, on remand, an Eighth Amendment analysis should apply to the restitution fine, because it is punitive in nature].)

The California Supreme Court will resolve the split in authority, having granted review of the issues presented by *Dueñas* in *Kopp*, *supra*, 38 Cal.App.5th at page 47. The Court will decide whether courts must "consider a defendant's ability to pay before imposing or executing fines, fees, and assessments," and if so, "which party bears the burden of proof regarding defendant's inability to pay." (*Kopp*, review granted, Nov. 13, 2019, S257844.)[3]

Here, the People do not attack *Dueñas*'s due process analysis, argue that *Dueñas* was wrongly decided, or argue that an Eighth Amendment analysis should apply as

---

[3] The Legislature attempted to codify *Dueñas*. It passed Assembly Bill No. 927 (2019-2020 Reg. Sess.), "requir[ing] a hearing on a defendant's ability to pay fines, fees, and assessments." (*People v. Belloso* (Nov. 26, 2019, B290968) ___ Cal.App.5th ___, [2019 WL 6317269, at p. *7, fn. 9].) The governor vetoed the bill. (*Ibid.*) In his veto message, "he agreed there is a need to 'tackle the issue of burdensome fines, fees and assessments that disproportionately drag low-income individuals deeper into debt,' but noted the issue needed to be addressed in the budget process to ensure adequate funding for the courts and victim compensation." (*Ibid.*)

opposed to due process. Instead, they argue that *Dueñas*'s due process concerns are not "at issue in this appeal," either because Taylor forfeited the issue or for other reasons discussed in the following subparts. Given that no party has argued *Dueñas* was wrongly decided or briefed whether an Eighth Amendment analysis should displace the due process analysis, we do not address those issues and instead simply apply *Dueñas*'s holding in this case.

B. *Forfeiture*

This court recently considered and rejected the forfeiture argument in *People v. Jones* (2019) 36 Cal.App.5th 1028 (*Jones*), an appeal that was also pending at the time *Dueñas* was decided. (*Id.* at p. 1030.) We declined to find forfeiture of a claimed *Dueñas* error "[b]ecause a due process objection would have been 'futile or wholly unsupported by substantive law then in existence.'" (*Id.* at p. 1033.) We held that "[g]iven the substantive law in existence at the time of Jones's sentencing, *Dueñas* was unforeseeable." (*Ibid*.) This conclusion applies with equal force to Taylor's case, at least as to the court operations and facilities fees. He did not forfeit an ability to pay objection to those fees.

The restitution fine is a different matter. Even before *Dueñas*, section 1202.4 permitted the court to consider Taylor's inability to pay. (*Jones*, *supra*, 36 Cal.App.5th at p. 1032.) The statute mandates that the court impose a restitution fine "unless it finds compelling and extraordinary reasons for not doing so," and "[a] defendant's inability to pay *shall not* be considered a compelling and extraordinary reason." (§ 1202.4, subd. (c), italics added.) However, the court may consider the defendant's inability to pay "in

29

increasing the amount of the restitution fine in excess of the minimum fine." (*Ibid.*) In *Jones*, the court imposed the minimum restitution fine required by statute—$300 for a felony conviction. (§ 1202.4, subd. (b)(1); *Jones*, at p. 1030.) "Because only the minimum amount was imposed, the statute strongly supported the conclusion that the trial court had no discretion to take ability to pay into account," and an objection based on inability to pay would have been futile. (*Jones*, at p. 1032.) *Dueñas* also involved the minimum restitution fine. (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1162; § 1202.4, subd. (b)(1).)

But in this case, the probation officer recommended that the court impose the maximum restitution fine of $10,000, and the court did so. (§ 1202.4, subd. (b)(1).) Taylor did not object or request an ability to pay hearing, even though the court could have considered the issue under the restitution statute. *Jones* is thus distinguishable on this point. The substantive law in existence at the time of Jones's sentencing would not have permitted the court to consider his inability to pay the minimum restitution fine (*Jones*, *supra*, 36 Cal.App.5th at p. 1032), whereas the law would have permitted the court to consider Taylor's inability to pay the maximum fine. Consequently, Taylor forfeited the objection that the court failed to consider his ability to pay the restitution fine. (*People v. Nelson* (2011) 51 Cal.4th 198, 227 & fn. 22.)[4]

---

[4] In his supplemental reply brief, Taylor insists that his trial counsel rendered ineffective assistance by failing to object to the maximum restitution fine. "[W]e do not consider an argument first raised in a reply brief, absent a showing why the argument could not have been made earlier." (*People v. Newton* (2007) 155 Cal.App.4th 1000, 1005.) Taylor has not made such a showing here.

We essentially approved this reasoning in *Jones*. There, we suggested that the result would have been different if the court had imposed a restitution fine above the minimum. (*Jones*, *supra*, 36 Cal.App.5th at p. 1033.) We discussed *People v. Frandsen* (2019) 33 Cal.App.5th 1126 (*Frandsen*), in which another court found a claim of *Dueñas* error forfeited, in part because the restitution fine in that case was the maximum $10,000. (*Id.* at p. 1154.) We reasoned that *Frandsen* "was correct to conclude" that an objection to the restitution fine based on inability to pay "'would not have been futile under governing law at the time of his sentencing hearing.'" (*Jones*, at p. 1033.)

Some courts have suggested that the failure to object to a maximum restitution fine necessarily forfeits the *Dueñas* claim with respect to the court operations and facilities fees. *Frandsen*, for instance, concluded that the defendant "was obligated to create a record showing his inability to pay the maximum restitution fine, which would have served to also address his ability to pay the assessments." (*Frandsen*, *supra*, 33 Cal.App.5th at p. 1154.) And "[g]iven his failure to object to a $10,000 restitution fine based on ability to pay," the defendant had "not shown a basis to vacate" $120 in fees. (*Ibid.*; accord *People v. Aviles*, *supra*, 39 Cal.App.5th at p. 1074.) Other courts have similarly held a *Dueñas* objection to fees forfeited because, "[a]s a practical matter," if a defendant does not object to a maximum restitution fine based on an inability to pay, the defendant "surely would not complain on similar grounds" regarding the additional fees. (*People v. Gutierrez* (2019) 35 Cal.App.5th 1027, 1033; accord *People v. Jenkins* (2019) 40 Cal.App.5th 30, 40-41, review granted Nov. 26, 2019, S258729.)

31

We do not know why Taylor failed to object to the maximum restitution fine, but there could have been reasons unrelated to his inability to pay. The defendant's inability to pay is just one among many factors the court should consider in setting the restitution fine above the minimum. The court should also consider "the seriousness and gravity of the offense and the circumstances of its commission, any economic gain derived by the defendant as a result of the crime, the extent to which any other person suffered losses as a result of the crime, and the number of victims involved in the crime. Those losses may include pecuniary losses to the victim or his or her dependents as well as intangible losses, such as psychological harm caused by the crime." (§ 1202.4, subd. (d).) Taylor may have concluded that, given the seriousness of his offenses and the psychological harm to his two victims, any objection to the maximum fine would have been fruitless. Those factors, however, have no bearing on the court operations and facilities fees. Under *Dueñas*, the only question is whether the defendant has an inability to pay the fees, and Taylor did not have the benefit of *Dueñas* at the time of his sentencing. We therefore will not construe his failure to object to the maximum restitution fine as a forfeiture of the *Dueñas* claim with respect to the fees.[5]

For these reasons, Taylor has forfeited his claim of *Dueñas* error with respect to the $10,000 restitution fine but not with respect to the $840 in court operations and facilities fees. As to those fees, the substantive law in existence at the time of his

---

[5] We note that at oral argument, the People expressly declined to take issue with the foregoing analysis, which was fully set forth in our tentative opinion.

sentencing "would have meaningfully foreclosed the argument he now seeks to advance." (*Jones*, *supra*, 36 Cal.App.5th at p. 1034.)

C. *Reversible Error*

The court did not determine Taylor's ability to pay the $840 in fees. Under *Dueñas*, this was error, and we must remand for an ability to pay hearing unless the error was harmless. (*Jones*, *supra*, 36 Cal.App.5th at pp. 1034-1035.) *Dueñas* determined the error was of constitutional magnitude, so we inquire whether the failure to conduct an ability to pay hearing was harmless beyond a reasonable doubt. (*Id.* at p. 1035.) We will find *Dueñas* error harmless if the record demonstrates, beyond a reasonable doubt, that the defendant cannot establish his or her inability to pay. (*Ibid.*)

The record here does not demonstrate that. According to the probation report, Taylor was 70 years old at the time of his sentencing. We have no information about his income-earning capacity before his conviction, other than the statements in the probation report that he has three years of college education and served four years in the Air Force. We do not know what jobs he has held or whether he has savings or assets to sell. And while the probation officer recommended that the court impose $750 in appointed counsel fees, the court declined to do so, finding that Taylor "lack[ed] the ability to pay" them. The court also rejected the probation officer's recommendation that Taylor reimburse the probation department $665 in presentence investigation costs. None of that information forecloses a meritorious inability to pay argument. On the contrary, if Taylor lacked the present ability to pay $750 in appointed counsel fees, it stands to reason that

33

he lacked the present ability to pay $840 in other fees. (§ 987.8, subd. (b) [the court determines the "present ability" of the defendant to pay appointed counsel fees].)

Moreover, although the court may consider Taylor's potential prison wages (*Castellano*, *supra*, 33 Cal.App.5th at p. 490), those also do not foreclose an inability to pay showing. "[E]very able-bodied" prisoner is required to work. (§ 2700; Cal. Code Regs., tit. 15, § 3040, subd. (a).) A prisoner's assignment to a paid position "is a privilege" that depends on "available funding, job performance, seniority and conduct." (Cal. Code Regs., tit. 15, § 3040, subd. (k); accord *People v. Rodriguez* (2019) 34 Cal.App.5th 641, 649.) Wages in prison range from $12 to $56 per month, depending on the job and skill level involved. (Cal. Code Regs., tit. 15, § 3041.2, subd. (a)(1).) Fifty percent of Taylor's wages and trust account deposits will be deducted to pay any outstanding restitution fine, plus another 5 percent for the administrative costs of this deduction. (§ 2085.5, subds. (a), (e); Cal. Code Regs., tit. 15, § 3097, subd. (f).)

We assume for the sake of argument that Taylor will secure a paying position earning the minimum monthly prison wage.[6] Assuming also that the entire $10,000 restitution fine is outstanding, he will have at least $5.40 per month available to settle $840 in fees. At that rate, he will pay off the fees in 156 months, or 13 years. Taylor's sentence on counts 5 through 8 will be stayed, so he will be serving a one-year determinate term plus 105 years to life (minus a credit of 951 days for presentence

---

[6]     At the ability to pay hearing on remand, the parties will have an opportunity to litigate the truth of this assumption, if they wish. It is possible, for example, that paid positions are relatively rare notwithstanding the statutory requirement that all able-bodied prisoners work. The record before us is, of course, silent on this issue.

custody and conduct). Taylor was 70 years old at the time of sentencing, however, and we know nothing about his health and whether he is capable of earning wages until he is 83 years old. Given that his ability to earn sufficient prison wages depends on those factors, we cannot say that potential prison work forecloses a meritorious inability to pay argument.

The People argue that "the record reveals no indication of an inability" to pay, and in particular, there is no indication Taylor "would be unable to perform prison work." The argument lacks merit because it misallocates the burden of proof on appeal. On remand, it will be Taylor's burden to show his inability to pay. (*Castellano*, *supra*, 33 Cal.App.5th at p. 490.) But it is not Taylor's burden on appeal to establish his inability to pay when the court did not hold an ability to pay hearing in the first place. (*Jones*, *supra*, 36 Cal.App.5th at p. 1035.) Rather, it is the People's burden to show that the *Dueñas* error was harmless beyond a reasonable doubt. (*People v. Stritzinger* (1983) 34 Cal.3d 505, 520 [the "beneficiary of the error" must prove that it was harmless beyond a reasonable doubt].) They cannot do that on this record, for all of the reasons just discussed.

The People further argue that, unlike the *Dueñas* defendant, Taylor has not identified any adverse consequences from nonpayment of the fees. According to the People, this "matters because it is the *consequences* of nonpayment that can potentially transform a court assessment into a due process violation." The argument lacks merit. Taylor "need not present evidence of potential adverse consequences beyond the fee or assessment itself, as the imposition of a fine on a defendant unable to pay it is sufficient

detriment to trigger due process protections." (*Castellano*, *supra*, 33 Cal.App.5th at p. 490.)

In sum, under *Dueñas*, the court may not assess $840 for court operations and facilities fees absent a determination that Taylor has an ability to pay them. The *Dueñas* error was not harmless on this record. We therefore must remand for an ability to pay hearing.

### DISPOSITION

The order imposing the court operations (§ 1465.8, subd. (a)(1)) and facilities fees (Gov. Code, § 70373, subd. (a)(1)) is reversed. On remand, the court shall hold a hearing on Taylor's ability to pay the fees. If Taylor demonstrates an inability to pay them, the court shall not impose the fees. If he fails to demonstrate his inability to pay them, the court may impose them. (*Castellano*, *supra*, 33 Cal.App.5th at p. 491.) In addition, Taylor's sentence on counts 5 through 8 is stayed. The court shall prepare an amended abstract of judgment and forward a copy to the California Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

CERTIFIED FOR PARTIAL PUBLICATION

MENETREZ

J.

We concur:

CODRINGTON

Acting P. J.

RAPHAEL

J.

36